# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **HOLLY BEGLEY o/b/o L.V.B.,** ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> **ANDREW SAUL,[1]** ) <br> **Commissioner of Social Security,** ) <br> Defendant ) | Civil Action No. 2:18cv000008 <br><br> **<u>MEMORANDUM OPINION</u>** <br><br> By: PAMELA MEADE SARGENT <br> United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Holly Begley, on behalf of her minor son, L.V.B., filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying L.V.B.'s claim for children's supplemental security income, ("SSI"), benefits under Title XVI of the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 1381-1383d. (West 2012 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Begley protectively filed an application for children's SSI on behalf of her son on February 27, 2014, alleging disability as of January 1, 2013, due to attention deficit hyperactivity disorder, ("ADHD"), and insomnia. (Record, ("R."), at 18, 231-34, 252.) Begley's claim was denied initially and on reconsideration. (R. at 122-24, 127-28, 130-33.) Begley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 134-35.) A hearing was held on November 3, 2016, (R. at 66-101), and a supplemental hearing was held on March 21, 2017, at which Begley was represented by counsel. (R. at 46-65.)

By decision dated June 5, 2017, the ALJ denied Begley's claim. (R. at 18-37.) The ALJ found that L.V.B. was born in 2010, and, therefore, was a preschooler on February 27, 2014, the date that the application was filed. (R. at 21.) The ALJ found that L.V.B. had not performed any substantial gainful activity since February 27, 2014, the application date. (R. at 21.) The ALJ found that the medical evidence established that L.V.B. suffered from severe impairments, namely ADHD; oppositional defiant disorder, ("ODD"); and recurrent upper respiratory infections, but he found that L.V.B. did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.) The ALJ further found that L.V.B. did not have an impairment or

combination of impairments which would result in marked and severe functional limitations. (R. at 22-36.) Therefore, the ALJ concluded that L.V.B. was not under a disability as defined by the Act and was not eligible for children's SSI benefits. (R. at 37.) *See* 20 C.F.R. § 416.924(d)(2) (2018); *see also* 42 U.S.C.A. § 1382c(a)(3)(C) (West 2012 & Supp. 2019).

After the ALJ issued his decision, Begley pursued her administrative appeals, (R. at 227), but the Appeals Council denied her request for review. (R. at 1-5.) Begley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2018). The case is before this court on Begley's motion for summary judgment filed September 25, 2018, and the Commissioner's motion for summary judgment filed November 26, 2018.

## *II. Facts*

L.V.B. was born in 2010. (R. at 231.) Begley testified that L.V.B. and his siblings were homeschooled. (R. at 59, 75.) She stated that L.V.B. could sit and maintain attention and concentration for only 10 minutes, if he was willing. (R. at 60.) Begley stated that L.V.B. was defiant and did not want to do what he was asked to do. (R. at 60-61.) She reported that L.V.B. picked on his siblings and threw tantrums; was disruptive in public; could not sit for long periods; could not comprehend much due to distractibility and inattentiveness; was impulsive to the point of being dangerous; and needed to wear pull-up diapers to bed. (R. at 56, 58-62, 76, 87-91.) She reported that L.V.B.'s medications had limited effect. (R. at 57, 78.) Begley testified that L.V.B. spent several consecutive days playing with a

toy car so vigorously that he sprained his right ankle and that he ran into a wall and bruised his right shoulder and hip. (R. at 56.)

In rendering his decision, the ALJ reviewed records from Leslie E. Montgomery, Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Johnson City Medical Center; Dr. Suresh Jain, M.D.; Southwest Virginia Child Development Clinic; Wise County Behavioral Health Services; Healing Waters Counseling Center, LLC, ("Healing Waters"); Elizabeth Jones, M.A., a licensed clinical psychologist; and Mountain View Regional Medical Center, ("Mountain View").

Begley argues that the ALJ erred by failing to find that L.V.B.'s impairments met or equaled the criteria of § 112.11, the listing for neurodevelopmental disorders. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) In particular, Begley argues that the ALJ erred by failing to find that L.V.B.'s impairments did not result in marked limitations in three domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; and (2) interacting and relating with others. (Plaintiffs' Brief at 6.) Thus, this statement of facts will specifically address evidence regarding L.V.B.'s behavior.

The record shows that Dr. Suresh Jain, M.D., was L.V.B.'s pediatrician from 2013 through 2017. On March 1, 2013, when L.V.B. was three years old, Dr. Jain noted that L.V.B.'s social, emotional, communicative, cognitive and physical development were normal. (R. at 299.) On February 28, 2014, Begley reported that

L.V.B. was hyperactive. (R. at 314.) Dr. Jain diagnosed questionable attention deficit disorder, ("ADD"). (R. at 314.) On April 13, 2014, Begley reported that L.V.B.'s hyperactivity was doing better on medication. (R. at 418.) On April 23, 2014, Begley reported that L.V.B. did not sleep well, and he was hyperactive. (R. at 329.) Dr. Jain diagnosed ADHD and prescribed Ritalin. (R. at 329.) On May 19, 2014, and June 16, 2014, Begley continued to complain that L.V.B. was hyperactive and that he had difficulty concentrating. (R. at 341, 343.) However, throughout 2014, 2015 and 2016, Begley reported that L.V.B.'s ADHD symptoms and sleep had improved with medication. (R. at 352, 356-57, 387, 393, 401-03, 412, 417-18, 438-39, 442, 444.)

On June 16, 2014, Leslie E. Montgomery, Ph.D., a state agency psychologist, indicated that L.V.B. had no limitations in his ability to acquire and use information; to move about and manipulate objects; to care for himself; and to care for his health and physical well-being. (R. at 106-07.) Montgomery reported that L.V.B. had a less than marked limitation in his ability to attend to and complete tasks and to interact and relate with others. (R. at 106.) L.V.B. was noted to have difficulty with complex tasks; he was able to play by himself and with others; he got along with peers; he could express his needs; and he could share and follow directions. (R. at 106.)

On October 16, 2014, Joseph Leizer, Ph.D., a state agency psychologist, indicated that L.V.B. had no limitations in his ability to acquire and use information; to move about and manipulate objects; to care for himself; and to care for his health and physical well-being. (R. at 117-18.) Leizer reported that L.V.B. had a less than marked limitation in his ability to attend to and complete tasks and to interact and

relate with others. (R. at 117-18.) L.V.B. was noted to have difficulty with complex tasks; he was able to play by himself and with others; he got along with peers; he could express his needs; and he could share and follow directions. (R. at 118.)

On February 26, 2014, Cynthia M. Jessee, C.P.N.P., a certified pediatric nurse practitioner with Southwest Virginia Child Development Clinic, evaluated L.V.B. at his mother's request. (R. at 361-65.) Begley reported concern about L.V.B.'s hyperactivity, anger, aggression, destructive behavior, yelling and sleep problems. (R. at 363.) Jessee reported that L.V.B. exhibited general learning within the average range; his vocabulary was within the average range; he had average visual-motor skills; he had an overall ability to process auditory input and reason verbally was within the average range; and his reasoning and processing skills were within the low average range. (R. at 362.) Jessee noted that L.V.B. had difficulty with anger control, emotional self-control and decision making, which negatively impacted his adaptability. (R. at 362.) She reported that L.V.B.'s observed and reported behaviors were consistent with ADHD and insomnia. (R. at 362.)

In September 2015, Begley described L.V.B.'s hyperactivity as mild. (R. at 411.) On November 4, 2015, Begley reported that, due to his hyperactivity, L.V.B. hit a screen door and bruised his face. (R. at 407.) On February 1, 2016, Begley reported that L.V.B. had a "temper tantrum" while at the grocery store and hit his right leg on the grocery cart. (R. at 399.) Dr. Jain diagnosed right foot strain and attention deficit disorder, ("ADD"). (R. at 399.) On March 25, 2016, Begley reported that L.V.B. was doing fair, and she described his hyperactivity as mild. (R. at 394.) On May 25, 2016, Begley reported that L.V.B. was hyperactive despite

taking his medication. (R. at 391.) On June 17, 2016, it was noted that L.V.B.'s hyperactivity continued to increase. (R. at 390.) On July 11, 2016, Dr. Jain noted L.V.B.'s history to include ADHD and autism. (R. at 388.)

On October 3, 2016, L.V.B. was seen at Healing Waters upon referral of Dr. Jain. (R. at 422-27.) Begley expressed concern about L.V.B.'s obsessive compulsive disorder, ("OCD"), symptoms. (R. at 422.) Begley reported that in the past six months, L.V.B. often did not pay attention to details or made careless mistakes; often had difficulty with attention; very often did not listen when spoken to directly; occasionally would not follow through when given directions; failed to complete activities; became easily distracted by noises and other stimuli; often left his seat and ran around when expected to remain seated; very often interrupted others and argued with adults; never acted fearful or anxious; never behaved sad, unhappy, or depressed; and exhibited overall average school performance in reading, writing and math. (R. at 422-23.) Begley reported that L.V.B. pushed his brother and sent him to the emergency room due to an injured nose. (R. at 425.) Connie Elkins, L.P.C., a licensed professional counselor, noted that L.V.B.'s ADHD symptoms significantly improved with medication. (R. at 425.) Mental status examination revealed L.V.B. had appropriate dress; adequate grooming and hygiene; cooperative behavior; normal psychomotor activity; a slow and soft speech; euthymic mood and congruent affect; and intact concentration and attention. (R. at 426.) Elkins diagnosed ADHD, predominantly hyperactive/impulsive presentation and recommended continued counseling. (R. at 426-27.)

On October 17, 2016, L.V.B.'s mental status examination again revealed normal findings. (R. at 420.) Elkins assessed that L.V.B. was understandable despite a moderate speech impediment; followed instructions and focused on activities without requiring redirection; and easily redirected to various tasks and applied rules of new games and activities. (R. at 420.) Elkins reported, "[u]pon tossing the ball in the question and answer game he was noted to perform in a developmentally appropriate manner that included catching the ball, answering the question, and tossing the ball in succession." (R. at 420-21.) Elkins stated that no obsessive or compulsive tendencies were noted, with the exception of Begley's report. (R. at 421.) She reported that L.V.B.'s medications effectively managed his ADHD, behavior and focus. (R. at 421.) Elkins reported that L.V.B. appeared to experience anxiety as expressed by clinging to his mother, fears for safety and timidity. (R. at 421.) Elkins diagnosed ADHD, predominantly hyperactive/impulsive presentation and anxiety disorder. (R. at 421.)

On December 5, 2016, Elizabeth A. Jones, M.A., a licensed psychological examiner, conducted a consultative examination at the request of Disability Determination Services. (R. at 430-35.) L.V.B.'s affect was somewhat restricted with congruent mood; he exhibited appropriate grooming and hygiene; he separated easily from his mother; he remained seated during the evaluation despite not having taken his medication; he was passively defiant, but had no difficulty with directions; he had no significant difficulty with attention or concentration, although he put forth very poor effort into all tasks requested; he made excellent eye contact; and at times appeared to intentionally misrepresent his level of ability to perform and/or comprehend. (R. at 430, 432-33.) L.V.B. could spell his name very quickly, recite

the alphabet and state the names of the family's four pets. (R. at 432.) Begley reported that L.V.B. broke things; ran; kicked; punched holes in walls; and threw tantrums in stores. (R. at 431.) L.V.B. stated that he wanted to attend public school, but his mother would not let him because of a bus accident. (R. at 432.) Jones reported that L.V.B. did not present as overly active during the evaluation, but he was "passively defiant." (R. at 434.) Because of such behavior, the test results suggestive of borderline intelligence could not be validated. (R. at 434.) Jones also reported that she could not make a medical/mental assessment of L.V.B.'s limitations regarding his ability to perform at an age-appropriate level due to L.V.B.'s "unwillingness to perform on the measure of intelligence and possible intentional misrepresentation of his true level of functioning." (R. at 434.) Jones diagnosed ODD and ADHD, combined type, by history. (R. at 434.)

On December 28, 2016, L.V.B. presented to the emergency room at Mountain View for complaints of blood in his stool. (R. at 447-59.) It was noted that, despite L.V.B.'s past medical history, including ADHD, L.V.B. was not hyperactive. (R. at 451.)

On January 30, 2017, Begley described L.V.B.'s hyperactivity as mild while on medication. (R. at 467.)

On March 23, 2017, L.V.B. underwent an evaluation at Wise County Behavioral Health Services. (R. at 472-74.) Susan Bolling, L.P.C., a licensed professional counselor, noted that L.V.B.'s mood was happy with a congruent affect; he did not indicate that he was a danger to himself or others; he dressed

appropriately for the weather; and exhibited acceptable grooming and hygiene. (R. at 472.) Begley reported that L.V.B.'s medications did not seem to help; he had mood swings; he exhibited limited OCD behaviors, including washing his toys with soap and water daily and being "very touchy feely" with siblings; and he engaged in self-injurious behavior like running into walls. (R. at 472.) However, Begley indicated her intent to send L.V.B. to public school for the first time in the fall. (R. at 472.) Bolling diagnosed ODD and ADHD. (R. at 474.)

### III. *Analysis*

A child is considered disabled for SSI purposes only if the child suffers from a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and which lasts for a period of not less than 12 months. 42 U.S.C.A. § 1382c(a)(3)(C)(i) (West 2012). The Commissioner uses a three-step process in evaluating children's SSI claims. *See* 20 C.F.R. § 416.924 (2018). This process requires the Commissioner to consider, in order, whether the child 1) is engaged in substantial gainful employment; 2) has a severe impairment; and 3) has an impairment that meets or equals the requirements of a listed impairment. *See* 20 C.F.R. § 416.924. As with the process for adults, if the Commissioner finds conclusively that a child is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.924. Thus, under the applicable regulations, an ALJ may find a child to be disabled within the meaning of the Social Security Act only if he finds that the child has a severe impairment or combination of impairments that meets or equals an impairment listed in Appendix 1. *See* 20 C.F.R. § 416.924(c)-(d) (2018).

In her brief, Begley contests the ALJ's finding that L.V.B.'s impairments did not satisfy the criteria of § 112.11, the listing for neurodevelopmental disorders. (Plaintiff's Brief at 4-6.) In particular, Begley argues that the ALJ erred by failing to find that L.V.B.'s impairments did not result in marked limitations in three domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; and (3) interacting and relating with others. (Plaintiffs' Brief at 6.)

As stated above, the court must determine if there is substantial evidence in the record to support the ALJ's decision that L.V.B. was not under a disability as defined in the Act. If substantial evidence exists to support this finding, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws*, 368 F.2d at 642. Also, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). "Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays*, 907 F.2d at 1456.

Based on my review of the record, I find that substantial evidence exists in the record to support the ALJ's decision that L.V.B.'s impairments did not functionally equal a listed impairment. An impairment is of listing-level severity if the child has "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(d) (2018). The six domains that are considered in the functional comparison are: (1) acquiring and using

information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; (6) and health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1) (2018). As noted above, Begley challenges the ALJ's decision regarding only three domains of functioning.

A "marked" limitation in a domain is found when an impairment interferes seriously with a claimant's ability to independently initiate, sustain or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i) (2018). A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). The regulations define an "extreme" limitation as one that is more than marked and "interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (2018). Based on my review of the record, I find that the ALJ fully analyzed the evidence and properly determined that L.V.B.'s impairments did not functionally equal a listed impairment. (R. at 18-37.)

In order to meet Listing 112.11, a claimant must satisfy all of the requirements listed in both paragraph A and paragraph B. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.11 (2018). Specifically, paragraphs A and B state:

> A. Medical documentation of the requirements of paragraph 1, 2, or 3:
>    1. *One* or both of the following:
>       a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
>       b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
>    2. Significant difficulties learning and using academic skills; or
>    3. Recurrent motor movement or vocalization.

AND

> B.  Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):
>     1.  Understand, remember, or apply information (see 112.00E1).
>     2.  Interact with others (see 112.00E2).
>     3.  Concentrate, persist, or maintain pace (see 112.00E3).
>     4.  Adapt or manage oneself (see 112.00E4).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.11.

The ALJ noted that, despite evidence showing that L.V.B. exhibited hyperactivity during several psychological evaluations, he also exhibited cooperative behavior, good eye contact, intact memory, intact attention and concentration and an appropriate mood and affect. (R. at 22, 363, 420-21, 426.) The ALJ also noted that the March 2017 mental health evaluation showed that L.V.B. had a happy mood and congruent affect; he did not indicate that he was a danger to himself or others; he dressed appropriately for the weather; and he displayed acceptable grooming and hygiene. (R. at 22, 472 .)

The ALJ found that L.V.B. did not have any limitations in his ability to acquire and use information. (R. at 30.) The state agency psychologists found that L.V.B. had no limitation in this domain. (R. at 30, 106, 117.) In February 2014, it was noted that test results reflecting a low average level of cognitive functioning should be considered with caution because, upon testing of general learning, L.V.B. exhibited average ability, and his overall ability to process auditory input and reason verbally was within the average range. (R. at 30, 362.) L.V.B. had average visual-motor skills and exhibited low average ability only in the tasks of putting together complex objects by seeing and mentally manipulating the object's

individual parts. (R. at 362.) In October 2016, L.V.B. was understandable, despite a moderate speech impediment; he followed instructions and focused on activities without requiring redirection; he was easily redirected to various tasks; and he applied rules of new games and activities. (R. at 420.) Elkins reported that, "[u]pon tossing the ball in the question and answer game he was noted to perform in a developmentally appropriate manner that included catching the ball, answering the question, and tossing the ball in succession." (R. at 420-21.) In December 2016, L.V.B. could spell his name very quickly, recite the alphabet and state the names of the family's four pets. (R. at 432.) Jones reported L.V.B. to be "passively defiant," but also reported that L.V.B. appeared to have no difficulty with directions. (R. at 430, 434.) Jones noted that Begley was applying for disability benefits based on L.V.B.'s ADHD and insomnia and noted that, at times, L.V.B. "appeared to intentionally misrepresent his level of ability to perform and/or comprehend." (R. at 430, 434.) Based on this, I find that substantial evidence exists to support the ALJ's finding that L.V.B. was not limited in his ability to acquire and use information.

The ALJ found that L.V.B. had less than marked limitations in his ability to attend to and complete tasks. (R. at 31-32.) Again, the ALJ relied on the opinions of the state agency psychologists. (R. at 31-32.) Montgomery and Leizer noted that L.V.B. had difficulty with complex tasks, but reportedly could watch television for up to 15 minutes; could dress himself; brush his teeth; feed himself; and could play by himself and with others. (R. at 106, 118.) In addition, in February 2014, L.V.B. had no difficulty transitioning from the hallway to the evaluation room; he had an appropriate mood and affect; and he seemed persistent and motivated. (R. at 363.) While L.V.B. took several seconds to respond verbally to some questions and got out of his chair several times during the evaluation, he seemed to enjoy verbal praise when he followed instructions and took his seat. (R. at 363.) L.V.B. "engaged in some spontaneous self-corrective behavior during measures of his visual processing

and non-verbal reasoning." (R. at 363.) In October 2016, L.V.B. displayed intact attention and concentration; he followed instructions and focused on activities without requiring redirection; and he was easily redirected to various tasks. (R. at 420, 426.) In December 2016, Jones opined that L.V.B. had no significant difficulty with attention or concentration despite his poor effort. (R. at 432.) Based on this, I find that substantial evidence exists to support the ALJ's finding that L.V.B. had a less than marked ability to attend to and complete tasks.

The ALJ also found that L.V.B. had "less than marked" limitation in interacting and relating with others. (R. at 33.) As noted by the ALJ, the state agency psychologists opined that L.V.B. had a less than marked limitation in this domain. (R. at 33, 106, 118.) The state agency psychologists found that L.V.B. played well with others and got along with his peers. (R. at 106, 118.) L.V.B. could share and follow directions, and he was understood most of the time by people who knew him and some of the time by others. (R. at 106, 118.) During an evaluation in February 2014, L.V.B. got loud, was very physically active and demonstrated substitutions and omissions in some of his articulation. (R. at 363.) During this evaluation, L.V.B. established and maintained appropriate eye contact; he demonstrated a range of appropriate mood and affect; he seemed to enjoy verbal praise when he followed instructions; he took his seat after getting out of his chair several times; and he used his hands cooperatively when required. (R. at 363.) In October 2016, L.V.B. was cooperative; he made good eye contact; he had normal psychomotor activity; and he exhibited no obsessive or compulsive tendencies. (R. at 420-21.) L.V.B. exhibited anxiety about attending school due to concerns with bus safety, but he still wanted to attend school. (R. at 421.) In December 2016, Jones opined that L.V.B.'s mild articulation disorder did not affect his ability to communicate, and he made very few spontaneous verbalizations. (R. at 432.) In March 2017, L.V.B. demonstrated a

happy mood and congruent affect. (R. at 472.) During several sessions with Dr. Jain, L.V.B. was active, playful and smiling. (R. at 300, 305-06, 344-48.)

Furthermore, the record shows that L.V.B.'s symptoms improved significantly with medication. (R. at 352, 356-57, 387, 393, 401-03, 412, 417-18, 421, 425, 438-39, 442, 444, 467.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Despite some difficulty with hyperactivity, upon testing, L.V.B. exhibited general learning within the average range; vocabulary within the average range; average visual-motor skills; and an overall ability to process auditory input and reason verbally within the average range. (R. at 362.) L.V.B. exhibited a low average ability only in the tasks of putting together complex objects by seeing and mentally manipulating the object's individual parts. (R. at 362.) In addition, Begley described L.V.B.'s hyperactivity as "mild." (R. at 394, 411, 467.) Based on this, I find that substantial evidence exists to support the ALJ's finding that L.V.B. had a less than marked ability to interact and relate to others.

Based on the above, I find that substantial evidence exists to support the ALJ's finding that there was no indication that L.V.B.'s impairments functionally equaled a listed impairment. I also find that substantial evidence exists to support the ALJ's finding that L.V.B. was not disabled. An appropriate Order and Judgment will be entered.

DATED: August 23, 2019.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE